1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RUSSELL SAMUEL TRUNZO,

          Petitioner,

  v.

STEVE ORNOSKI, Warden, et al.,

          Respondents.

_____/

No. C 05-0734 JSW

**ORDER GRANTING PETITION FOR A WRIT OF HABEAS CORPUS**

**I. INTRODUCTION**

      Petitioner Russell S. Trunzo ("Trunzo"), a state prisoner incarcerated at San Quentin State Prison, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. The Petition is now ripe for consideration on the merits, and for the reasons set forth below, the Petition is GRANTED.

**II. BACKGROUND**

**A.    Procedural History.**

      On July 12, 1979, Trunzo was convicted by a jury of second-degree murder and was sentenced to a prison term of fifteen years to life. Trunzo does not challenge the validity of his underlying conviction or the sentence imposed by the trial court. Rather, Trunzo's claims are premised on the Board of Prison Term's ("Board") decision to deny him parole at a parole suitability hearing held on April 29, 2003 (the "April 2003 Hearing").[1]

---

    [1]    California has since replaced the Board of Prison Terms with the Board of Parole Hearings. *See* Cal. Penal Code § 5075(a).

Before his April 2003 Hearing, Trunzo also had appeared before the Board on August 14, 2000, and March 21, 2002. After he was denied parole at those hearings, he filed a petition for a writ of habeas corpus before the Superior Court of California, County of Stanislaus (the "Superior Court"). (*See* Answer, Ex. F.) On May 19, 2003, Trunzo notified the Superior Court of the Board's decision at the April 2003 Hearing and urged that court to grant his petition and release him from custody. (Petition ("Pet."), Appendix ("App.") A, Vol. IV, Ex. N.) On June 13, 2003, the Superior Court denied Trunzo's habeas petition without reference to the April 2003 Hearing. (Answer, Ex. F.)

On June 27, 2003, Trunzo filed a motion for reconsideration of the Superior Court's decision to deny his petition. (Pet., App. A, Vol. IV, Ex. P.) On August 26, 2003, Trunzo filed an administrative appeal of the Board's decision to deny him parole at the April 2003 Hearing. (*Id.*, Ex. T.) There is no evidence in the record as to how the appeal was resolved, and Respondents contend that there is no record of the appeal. (*See* Answer, Ex. E (Declaration of S. Labare, ¶ 3.)

On October 7, 2003, the court denied Trunzo's motion for reconsideration, again without mention of the April 2003 Hearing. (Answer, Ex, G.) On September 16, 2004, the California Court of Appeal, Fifth Appellate District summarily denied Trunzo's petition. (*Id.*, Ex. H.) On December 15, 2004, the Supreme Court of California summarily denied review of Trunzo's habeas petition. (Pet., App. A, Vol. IV, Ex. V.)

On February 18, 2005, Trunzo timely filed the instant petition.[2] Respondents filed an answer on September 12, 2005. Trunzo filed a traverse on November 14, 2005. On February 23, 2007, Trunzo sought leave to file a supplemental memorandum of points and authorities, which the Court subsequently granted. On February 22, 2008, at the Court's request, Trunzo

---

[2] It is not clear from the record whether Trunzo filed a petition before the Superior Court raising the April 2003 Hearing. Nor is it evident from the record whether he raised the April 2003 Hearing in his petitions to the California Court of Appeal or the California Supreme Court. Notwithstanding this fact and notwithstanding their contention that there is no record of an administrative appeal of the April 2003 Hearing, Respondents have expressly waived exhaustion as an affirmative defense. (Answer ¶15.)

filed a status report, in which he states that the Board has denied him parole at four subsequent hearings. Respondent has not submitted any response to this status report.

**B.    Factual Background.**

The facts of the offense are pertinent to the resolution of Trunzo's claims and taken from the Life Prisoner Evaluation that was prepared for the April 2003 Hearing[3]:

1. Summary of Crime

On the morning of 12-21-78, Leota Hill left her 2 year old child, the victim in this case, in Trunzo's care so she could go to work at a café across the street from the motel room where all three had been residing. At approximately 12:15 p.m. Trunzo left the victim alone in the motel room when he went out to buy cigarettes. Trunzo went to the café to get change to buy the cigarettes and then returned to the motel room. Ms. Hill had expected Trunzo to meet her for lunch at 1:00 p.m. and when he failed to appear a male co-worker went to the motel room to check on him. Trunzo reported that he would be along shortly and appeared to be under the influence of drugs. When Trunzo failed to appear a female co-worker went to check at the motel room and Trunzo told her to get Ms. Hill. Ms. Hill arrived to discover Trunzo dressing and the victim in apparent distress. She returned to the café and informed the manager that she was taking her child to the hospital. Together, Ms. Hill and Trunzo persuaded a neighbor to give them a ride to the hospital.

Upon examination of the victim by the hospital physician and during the subsequent autopsy, evidence of previous physical abuse was discovered. As reported in the Probation Officer's Report (POR), the autopsy indicated that the bruises to the child's left abdomen, the head, each side of the chin, and shoulders were all recent. The injuries to the head "were likely caused by someone holding onto the child's chin as to keep the head steady while the child was being struck with the other hand in the face and head area." The autopsy indicated that "no instrument other than the hands were used in administering the blows" which resulted in the child's death. However, there were also indications that the child had been beaten during the two-week period prior to his death. The POR notes that "there is no information available which indicates the charge of child abuse. [*sic*] The following day Trunzo was re-arrested for murder when the victim died from the head trauma.

2. Prisoner's Version

Trunzo stated that the offense summary was essentially correct as written, except he related details of the incident which describe injuries to the victim which differ somewhat from the autopsy evidence described in the [POR]. Trunzo noted that sometime after the 1:00 p.m. [*sic*] the victim wet his

---

[3]    At the April 2003 Hearing, the Presiding Commissioner stated that he wanted to incorporate by reference facts relating to the commitment offense and Trunzo's version of events, as set forth in the Life Prisoner Evaluation. Petitioner, through counsel, did not object. (*See* Pet., App. A, Vol. I, Ex. A (Transcript of April 2003 Hearing ("April 2003 Tr.") at 7:17-26).)

diaper. This occurred after the first co-worker came to their hotel room, but before the second co-worker arrived. Trunzo slapped the victim on the face then placed him on the toilet seat hoping to encourage a bowel movement. As he watched, the victim got off the toilet and defecated on the outside of the toilet. Trunzo then put him back on the toilet, grabbed him by the shoulders and shook him, slapped him on the face again, and then placed him back on the toilet. When the victim got off the toilet again Trunzo put him back on the toilet, grabbed his face in his hands and held his face while he talked to him, then shook him by the shoulders again. This time when he shook him he caused [the victim's] head to strike the back of the toilet, rendering the victim semi-conscious. He then held the victim under the shower trying to revive him. When he could not revive the victim he got dressed intending to go for help. While dressing the second co-worker arrived and he sent her to get Ms. Hill. Trunzo and Ms. Hill then persuaded a neighbor to take them to the hospital.

Trunzo noted that he had been fighting with Ms. Hill over previous two weeks [*sic*] due to his belief that she had been dating or sleeping with other men and that she had given him gonorrhea. They had been fighting the previous evening until 5:00 p.m. and had been drinking heavily. He was also under stress because he recently lost his job. The stress led him to take his anger out on the victim. He acknowledged full responsibility and genuine remorse for causing the death of the victim. He stated, however, that during the trial the prosecutor incorrectly tried to make it sound like he had beaten the victim repeatedly until the victim died. In the interview, Trunzo initially chose to characterize the incident as an accidental "shaken baby" death. When questioned about the extent of the recent injuries and bruising on the victim, he acknowledged that he caused the bruising to the face and shoulders. He believes that the cuts on the victim's lips were caused by the victim biting his lip when Trunzo caused him to hit his head to the back of the toilet. When questioned about whether a "shaken baby" incident would cause the extensive bruising and injuries, which he acknowledged he caused, he admitted that he was physically violent with the child. He and Ms. Hill were heavily involved in substance abuse and drinking and as a result of this behavior and both working [*sic*], the victim had not been cared for properly for some time as a result he had injuries, scabs, and sores on his body that had not been properly care [*sic*] for. These may explain what the autopsy described as evidence of prior physical abuse. Trunzo's version of the offense is the same as stated in the [Board's] report dated March 2002.

(Answer, Ex. C at 2-3).)

During the course of the April 2003 Hearing, the Board reviewed Trunzo's prior criminal history, which included a conviction for possession of LSD at age eighteen, a conviction at nineteen for possession of marijuana in Yosemite National Park, for which he was fined $25, and a conviction for auto burglary at age twenty. (April 2003 Tr. at 8:11-11:23; Answer, Ex. C at 3.) The Board also reviewed Trunzo's educational programming and his vocational efforts, including the fact that he had completed his GED, an Associate of Arts

degree from Patton College, and a Bachelor of Science degree in Psychology from California

Coast University.  (*Id.* at 16:19-18:16.)

The Board also noted that Trunzo had participated in numerous self-help and therapy

programs including, but not limited to, Reality Decision Making, Interpersonal Transactional

Analysis, Building Self-esteem and Assertiveness, Beginning Stress Management, Lifer

Decision Making and Introspective Analysis Therapy Group, Rational Behavior Training

Group, Overcomers Outreach, Katargeo, and Project Impact.  Further, Trunzo was learning to

become a domestic violence facilitator with the group Man Alive.  (*See* Answer, Ex. C at 5-6.)

Trunzo had participated in Narcotics Anonymous since 1987, and had participated in Alcoholics

Anonymous since 1993.  (*Id.* at 6.)  Trunzo's supervisors and group leaders praised him

consistently for his participation and leadership in these groups, as well as for his work in sheet

metal and machinery.  Additionally, Trunzo received praise for his assistance with the

retrofitting of the prison ventilation system.  (Answer Ex. C at 5; April 2003 Tr. at 19:17-20:8.)

The Board also reviewed Trunzo's prison disciplinary record, finding that although he

had several violations early in his incarceration, he had remained disciplinary free since 1988.

(*Id.* at 21:11-20.)[4]  The Board also reviewed the report prepared by Trunzo's counselor, who

observed:

> Considering the commitment offense, age at the time of the offense, minimal
> prior record, positive programming since incarceration, disciplinary free
> conduct since 1986[5], prison adjustment and family support this writer
> believes the prisoner would pose a low to average degree of threat to the
> community if released.  The degree of threat would greatly increase should
> Trunzo use alcohol and drugs.  He has family support and significant job
> skills to enable him to function in society.  Trunzo has taken full advantage
> of Self-Help/Therapy and Educational opportunities afforded him during his
> incarceration.  Trunzo has insight into his past behavior, which lead to the
> commission of the instant offense.  Trunzo appears to have genuine remorse
> for his victim and the victim's family.  It is recommended that if Trunzo is

---

[4]      Trunzo's last major disciplinary action occurred in 1988 and was related to an attempt to smuggle drugs into the institution.  (Pet., App. A, Vol. IV, Ex. U at 1054.)

[5]      This would appear to be a typographical error as both parties agree that Trunzo's last major disciplinary action occurred in 1988, although he received a "128" in 1996.

1   released on parole, he be placed on High Control with a special condition of
2   no contact with minors.

3   (Answer, Ex. C at 7-8; April 2003 Tr. at 25:2-26:13.)

4       The Board also considered the psychiatric report prepared by Dr. Rueschenberg on

5   February 19, 2002, which had been prepared for Trunzo's 2002 parole hearing. (April 2003 Tr.

6   at 26:7-29:21.) Dr. Rueschenberg summarized past psychological and psychiatric evaluations

7   of Trunzo as follows:

8           In his report dated 9-16-92, Dr. Garrett Essres concluded that Mr. Trunzo
            was not ready for parole, and that he needed to explore the negative aspects
9           of his personality related to feelings of anger, resentment and a need for
            revenge. In his Category X Evaluation dated 7-28-94, Dr. Roudebush
10          estimated his risk for violence as "unlikely to reoccur as long as he remains
            free of mind-altering drugs...needs to explore inner hostility and anger
11          further." He was diagnosed with Polysubstance Dependence and Personality
            Disorder NOS. In the Category X Psychological Council Evaluation report
12          dated 8-25-94, Drs. Lyon and Roudebush commented, "The Council sees
            inmate Trunzo as moving toward a healthier self-assessment and as having
13          a good chance for a successful parole." On 12-30-95, Dr. Foster stated, "Mr.
            Trunzo has made tremendous strides in the past eight years...his potential for
14          violence is below that of the average inmate." On 1-8-98, Dr. Carr also
            estimated his risk as below average, and on 5-6-99, Dr. Temkova opined "his
15          level of dangerousness to the community should be based on other than
            psychiatric grounds."
16

17  (Answer, Ex. D at 4.)

18      Dr. Rueschenberg also used three psychological instruments to "assess future risk for

19  violence in the community." (Id. at 5.) On the Hare Scale, "a measure of static risk factors

20  associated with risk for violence," Trunzo scored "within the low range of severity." According

21  to Dr. Rueschenberg, that score indicates "that [Trunzo] does not have an antisocial orientation

22  and psychopathy is not a significant risk factor. This score is not likely to change over time."

23  (Id.) On the History Clinical Risk-20 instrument, which "included dynamic risk factors,"

24  Trunzo scored "within the low-to-moderate range of severity." (Id.) Dr. Rueschenberg noted

25  that Trunzo's "slightly higher elevation on this instrument is largely reflected by historical

26  factors related to numerous adjustment problems in adolescence and early adulthood." (Id.)

27  Lastly, on the Violence Risk Appraisal Guide, "an actuarial method of risk assessment," Trunzo

28  scored "within the low-to-moderate range." (Id.) Dr. Rueschenberg concluded:

> Overall, Mr. Trunzo appears to have a low-to-moderate risk for violence in the community. When the offense occurred, he was unemployed and living a nomadic existence, moving from one state and city to another, without any sense of direction or purpose. He was actively abusing drugs, and he seemed to have no recognition of the self-destructive elements within his personality, and the underlying feelings of anger and hostility. His substance abuse seems to have been, at least in part, precipitated by chronic feelings of inadequacy.
>
> Clearly, Mr. Trunzo is not normally prone to violence. There is no documentation of overt violence during his long incarceration in prison. The index offense seems to have been precipitated by intense situational stressors and a lack of coping mechanisms. When the crime occurred, he was young, immature and ill prepared to be in a parental role. During the early part of his incarceration, Mr. Trunzo showed a tendency to minimize the severity of the offense, referring to it as an "accident." This minimization does not seem to have been part of a criminal orientation, but reflective of the offense being ego dystonic and not fitting within his self-image as a non-violent person.
>
> At present, it does not appear likely that the circumstances surrounding the index offense would recur. The adjustment problems that characterized his adolescence and early adulthood now seem to be adequately contained. In recent years, he has established a pattern of effective programming, and he seems to have increased insight into the index offense, his substance use problems and the weakness in his personality. Nonetheless, if granted parole it would probably be in the best interest of the community for Mr. Trunzo to be required to participate in a substance abuse program and drug testing. Also, one of his conditions for parole would likely be an interval of either restricted or monitored contact with children.

(*Id.* at 6.)

The Board also discussed Trunzo's three sets of parole plans for release in various geographic locations and found them to be suitable.[6] (April 2003 Tr. at 29:25-35:14.) The Stanislaus County District Attorney spoke at the hearing and opposed parole, noting that he never believed Trunzo had been candid about the circumstances surrounding the killing. (*Id.* at 39:1-41:5.)

The Board unanimously found Trunzo unsuitable for parole and found that he would pose an unreasonable risk of danger to society if released. (April 2003 Tr. at 54:9-2.) The Presiding Commissioner set forth the reasons for the Board's decision as follows:

---

[6] Trunzo planned either to live with his wife of ten years in California or, together with his wife, with his parents in Florida. His wife, siblings, parents, mother-in-law, and step-son all wrote letters of support for Trunzo's release and provided offers of housing, financial support, and employment. Trunzo also submitted invitations to join substance abuse support groups, including acceptance at a long-term transitional living program for alcoholics and drug addicts to maintain sobriety.

First of all would be the commitment offense. The offense was carried out in a cruel manner. The crime was committed against a two-year-old child that was particularly vulnerable and incapable of defending himself or fleeing. And the motive for the crime is inexplicable and very trivial in relation to the offense. These conclusions are drawn from the Statement of Facts where the victim, John Hill, a two year old, was abused and died from injuries he received from the prisoner, where he was slapped and shaken by the inmate. The infant died as a result of the injuries he sustained from the prisoner. The prisoner has failed to profit from society's previous attempts to correct his criminality. Such attempts include adult probation, county jail, and a felony conviction or a federal conviction for possession of marijuana.[7] The psychiatric report dated March 2002, authored by Erich Rueschenberg, ... a Forensic Psychologist, is not totally supportive of release ... .

(April 2003 Tr. at 54:12-55:7.)

The Board recommend that Trunzo remain disciplinary free, continue to participate in self-help, and it ordered a new psychiatric evaluation to: explore "the prisoner's violence potential in the free community, the significance of alcohol/drugs as it relates to the commitment offense[,] an estimate of the prisoner's ability to refrain from use/abuse of same when released, ... the extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes, the need for further therapy programs while incarcerated[;]" determine why Dr. Rueschenberg recommended limited or monitored contact with children; and clarify Trunzo's insight, remorse and empathy. (*Id.* at 56:20-25; Traverse, Exhibits at 00003.)[8]

### III. ANALYSIS

#### A.    Standard of Review.

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also Rose v. Hodges*, 423 U.S. 19, 21 (1971). The Ninth Circuit has applied § 2254(d) to review of parole suitability decisions. *See Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007);

---

[7]    As noted above, Trunzo was arrested in Yosemite National Park and charged with possession of less than one gram of marijuana. His sentence consisted of a $25 fine.

[8]    Many of these same issues had been explored in the approximately 17 previous psychiatric evaluations prepared while Trunzo has been incarcerated. (*See, e.g.,* Pet., App. A, Vol. IV, Ex. U at 01104-44.)

1    *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); *McQuillion v. Duncan*, 306

2    F.3d 895, 901 (9th Cir. 2002). Because the petition in this case was filed after the effective date

3    of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's

4    provisions apply. *Jeffries v. Wood*, 103 F.3d 827 (9th Cir. 1996) (en banc).

5            Under AEDPA, this Court may grant the petition with respect to any claim that was

6    adjudicated on the merits in state court only if the state court's adjudication of the claim: "(1)

7    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

8    established Federal law, as determined by the Supreme Court of the United States; or (2)

9    resulted in a decision that was based on an unreasonable determination of the facts in light of

10   the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Williams*

11   *v. Taylor*, 529 U.S. 362, 413 (2000) (hereinafter "*Williams*"). Courts are not required to address

12   the merits of a particular claim but may simply deny a habeas application on the ground that

13   relief is precluded by 28 U.S.C. § 2254(d). *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003). It

14   is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).

15   *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

16           "Clearly established federal law, as determined by the Supreme Court of the United

17   States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of

18   the time of the relevant state-court decision." *Williams*, 529 U.S. at 412; *Barker v. Fleming*,

19   423 F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time

20   of the state court's last reasoned decision); *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir.

21   2001). "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme]

22   Court's jurisprudence." *Williams*, 529 U.S. at 412. The Supreme Court has explained

23   repeatedly that AEDPA, which embodies deep-seated principles of comity, finality, and

24   federalism, establishes a highly deferential standard for reviewing state-court determinations.

25   *See id.* at 436. Thus, "[a] federal court may not overrule a state court for simply holding a view

26   different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."

27   *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

28

Under the "contrary to" clause of section 2254(d)(1), a federal court may grant the writ only if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision' of the Supreme Court and nevertheless arrives at a different result." *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06). Under the "unreasonable application" clause of section 2254(d)(1), a federal court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413.

A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412. The objectively unreasonable standard is not a clear error standard. *Lockyer*, 538 U.S. at 75-76; *Clark v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003). After *Lockyer*, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." *Clark*, 331 F.3d at 1068.

In determining whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the highest state court has summarily denied a petitioner's claim, the habeas court may "look through" that decision to the last state court addressing the claim in a reasoned decision. *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and where there is no reasoned lower court decision on the claim, the standard of

review under AEPDA is somewhat different. In such a case, an independent review of the record by the habeas court is the only means of deciding whether the state court's decision was objectively reasonable. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Further, the federal court need not otherwise defer to the state court decision under AEDPA. "A state court's decision on the merits concerning a question of law is, and should be, afforded respect. If there is no such decision on the merits, however, there is nothing to which to defer." *Greene v. Lambert*, 288 F.3d 1081, 1089 (9th Cir. 2002).

In this case, although the Superior Court issued a reasoned decision, that decision does not address the April 2003 hearing and, thus, the Court shall not "look through" the summary denials to this decision. Rather, the Court shall conduct an independent review of the record.

**B.      Legal Standards Applicable to Parole Suitability Determinations.**

California's parole scheme is set forth in California Penal Code § 3041, *et seq.* Section 3041(a) provides, in pertinent part:

> In the case of any inmate sentenced pursuant to any provision of law ... [o]ne year prior to the inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. ... The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates.

Cal. Penal Code § 3041(a).

Penal Code section 3041(b) provides, in pertinent part:

> The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Cal. Pen. Code § 3041(b).

Title 15 of the California Code of Regulations section 2402 (hereinafter "Section 2402") sets forth the criteria used to determine whether an inmate is suitable for release on parole. The opening paragraph of Section 2402(a) states:

Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

15 Cal. Code Regs. § 2402(a).

Section 2402(b) provides:

All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any considerations of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

*Id.* § 2402(b).

Circumstances tending to show unsuitability for parole are:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

12

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

*Id.* § 2402(c).

Circumstances supporting a finding of suitability for parole are:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands that nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was a result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the possibility of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

*Id.* § 2402(d).

The regulations also contain a matrix of suggested base terms depending on the murder degree and the circumstances surrounding the murder. The matrix provides three choices of suggested base terms for several categories of crimes. *See id.* § 2403. For second

13

1    degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years, to a high

2    of 19, 20 or 21 years, depending on some of the facts of the crime.[9]

3         Although the matrix is to be used to establish a base term, an inmate's base term is set

4    only when he or she has been found suitable for parole. *In re Dannenberg*, 34 Cal. 4th 1061,

5    1087 (2005). Thus, the statutory scheme places individual suitability for parole above a

6    prisoner's expectancy in an early setting of a fixed date designed to ensure term uniformity.

7    *Id.* at 1070-71.

8         While subdivision (a) of section 3041 states that indeterminate life (i.e., life-
          maximum) sentences should "normally" receive "uniform" parole dates for
9         similar crimes, subdivision (b) provides that this policy applies "*unless* [the
          Board] determines" that a release date cannot presently be set because the
10        particular offender's crime and/or criminal history raises "*public safety*"
          concerns requiring further indefinite incarceration. (Italics added.) Nothing
11        in the statute states or suggests that the Board must evaluate the case under
          standards of term uniformity before exercising its authority to deny a parole
12        date on the grounds the particular offender's criminality presents a
          *continuing public danger*.
13

14   *Id.* at 1070 (emphasis, brackets, and parentheses as in original). In sum, "the Board,

15   exercising its traditional broad discretion, may protect public safety in each discrete case by

16   considering the dangerous implications of a life-maximum prisoner's crime individually." *Id.*

17   at 1071. The California Supreme Court's determination of state law is binding in this federal

18   habeas action. *See Hicks v. Feiock*, 485 U.S. 624, 629 (1988); *Sandstrom v. Montana*, 442

19   U.S. 510, 516-17 (1979).

20        The California Supreme Court also has determined that the facts of the crime alone

21   can support a sentence longer than the statutory minimum, even if everything else about the

22   prisoner is laudable. "While the board must point to factors beyond the minimum elements of

23   the crime for which the inmate was committed, it need engage in no further comparative

24

25        [9]    One axis of the matrix concerns the relationship between murderer and victim
     and the other axis of the matrix concerns the circumstances of the murder. The choices on
26   the axis for the relationship of murderer and victim are "participating victim," "prior
     relationship," and "no prior relationship." The choices on the axis for the circumstances of
27   the murder are "indirect," "direct or victim contribution," and "severe trauma." Each of the
     choices are further defined in the matrix. *See* 15 Cal. Code Regs. § 2403(c).
28

analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." *Dannenberg*, 34 Cal. 4th at 1071; *see also In re Rosenkrantz*, 29 Cal. 4th 616, 682-83 (2002) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

**C.     The Board's Decision to Deny Trunzo Parole Violated Due Process.**

    **1.     Legal Standards.**

Trunzo contends that the Board's decision to deny him parole, at the April 2003 Hearing, violated Due Process. "In analyzing the procedural safeguards owed to an inmate under the Due Process clause, [a court] must look to two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural safeguards." *Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir. 2003).[10] The second prong of this test is satisfied if: (1) the inmate has been afforded an opportunity to be heard and, if denied parole, informed of the reasons underlying the decision; and (2) the Board's decision is supported "some evidence" or is not otherwise arbitrary. *Hayward v. Marshall*, 512 F.3d 536, 542 (9th Cir. 2008) (citing *Irons,* 505 F.3d at 851 and *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128-29 (9th Cir. 2006)); *Jancsek v. Oregon Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987).

Trunzo does not argue that he was denied an opportunity to be heard or that the Board failed to inform him of its reasons for the decision. Rather, he contends the Board's conclusion that he would pose an unreasonable risk of danger to society if released is both

---

[10]     Respondent urges the Court to deny Trunzo's Petition on the ground that Trunzo does not have a federally protected liberty interest in parole. This argument is foreclosed by controlling Ninth Circuit authority. *See, e.g., Irons*, 505 F.3d at 850 ("California Penal Code section 3041 vests ... all ... California inmates whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause."); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1125 (9th Cir. 2006) ("We hold that California inmates continue to have a liberty interest in parole after *In re Dannenberg*, 34 Cal. 4th 1061 (2005).").

arbitrary and not supported by "some evidence."  Respondent argues that the "some evidence" standard is not clearly established federal law.  Again, that argument is foreclosed by Ninth Circuit authority.  *See Sass*, 461 F.3d at 1129.

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion' reached by the parole board."  *Sass*, 461 F.3d at 1128 (quoting *Superintendent v. Hill*, 472 U.S., 445, 455-56 (1985)).  "*Hill*'s some evidence standard is minimal and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'"  *Id.* at 1129 (quoting *Hill*, 472 U.S. at 457).  Further, in order to determine whether the Board's decision to find Trunzo unsuitable for parole is supported by some evidence, this Court must focus not on whether some evidence "that a particular factor or factors indicating unsuitability exist," but on whether there is some evidence to conclude that "a prisoner's release will unreasonably danger public safety."  *Hayward*, 512 F.3d at 543 (citations omitted).

### 2.    Analysis.

At the April 2003 Hearing, the Board found Trunzo unsuitable for parole based on the following four findings: (1) "the offense was carried out in a cruel manner;" (2) "the motive for the crime is inexplicable and very trivial in relation to the offense;" (3) "the prisoner has failed to profit from society's previous attempts to correct his criminality;" and (4) Dr. Rueschenberg's report was "not totally supportive of release," because it purported to state that "Mr. Trunzo showed a tendency to minimize the severity of the offense, referring to it as an 'accident.'"  (April 2003 Tr. at 54:7-56:5.)

"A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's commitment offense only where the Board can 'point to factors beyond the minium elements of the crime for which the inmate was committed' that demonstrate the inmate will, *at the time of the suitability hearing*, present a

danger to society if released." *Irons*, 505 F.3d at 852 (quoting *Dannenberg*, 34 Cal. 4th at 1071) (emphasis added). These factors include the fact that "'[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering'" and that "'[t]he motive for the crime is inexplicable or very trivial in relation to the offense.'" *Id.* (quoting Cal. Code Regs. § 2402(c)(1)(D)-(E)).

The Board relied on sections 2402(c)(1)(D) and 2402(c)(1)(E) when it denied Trunzo parole. Second degree murder by its nature evinces a certain level of callousness because it "requires express or implied malice-i.e., the perpetrator must kill another person with the specific intent to do so; or he or she must cause another person's death by intentionally performing an act, knowing it is dangerous to life and with conscious disregard for life." *In re Smith*, 114 Cal. App. 4th 343, 366 (2003). As this *Smith* court noted, "[f]or this reason, it can reasonably be said that *all* second degree murders by definition involve some callousness- i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings or suffering of others." *Id.* (emphasis in original). "Therefore, to demonstrate 'an exceptionally callous disregard for human suffering' ... the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of second degree murder." *In re Scott*, 119 Cal. App. 4th 871, 891 (2004) (citations omitted).

In *Irons*, *supra*, the petitioner killed the victim following an argument over a suspected drug theft. Irons fired twelve rounds into the victim and, after the victim complained that he was in pain, Irons stabbed him twice in the back. Irons then wrapped the victim's body in a sleeping bag, and attempted to procure a car. During the ten days it took Irons to obtain a car, he left the victim's body in a room in the sleeping bag. Thereafter, Irons took the victim's body to the coast, weighted it, and disposed of it in the ocean. *Irons*, 505 F.3d at 849. The *Irons*' court compared the facts of Irons' commitment offense to the facts of the commitment offense in *Dannenberg*, in which the petitioner "struck multiple blows to his wife's head with a pipe wrench and then pushed her into a tub of water in which she drowned." *Id.* at 852. The *Irons* court concluded that "[b]ecause we find that Irons' crime was similarly cruel or vicious [to Dannenberg's crime], we cannot say that there was not

1    'some evidence' to support the Board's determination that Irons was unsuitable for parole

2    under California law." *Id.*

3         In this case, according to Trunzo, the facts underlying the commitment offense are:

4         he slapped the victim on the face then placed him on the toilet seat hoping to
          encourage a bowel movement. As he watched, the victim got off the toilet
5         and defecated on the outside of the toilet. Trunzo then put him back on the
          toilet, grabbed him by the shoulders and shook him, slapped him on the face
6         again, and then placed him back on the toilet. When the victim got off the
          toilet again Trunzo put him back on the toilet, grabbed his face in his hands
7         and held his face while he talked to him, then shook him by the shoulders
          again. This time when he shook him he caused his head to strike the back of
8         the toilet, rendering the victim semi-conscious.

9    The child ultimately died because of these injuries. (Answer, Ex. C at 2.) Although there is

10   evidence in the record that the victim in this case had been abused in the weeks prior to his

11   death, there is no clear evidence that Trunzo was solely responsible for those injuries, and the

12   record shows that the child's mother never claimed that he was. (*See, e.g.,* Answer, Ex. A at

13   00015.)

14        The facts of Trunzo's case are quite similar to the facts presented in *Fowler v. Butler*,

15   2007 WL 1555726 (E.D. Cal. May 23, 2007), *report and recommendation adopted*, 2007 WL

16   1725684 (E.D. Cal. Jun. 14, 2007). In that case, the petitioner was convicted of second

17   degree murder in the death of a twenty-two month old child, which resulted from the

18   petitioner slapping the child with "full force, knocking the child from [a] bed onto the floor."

19   *Id.* at *2. The petitioner claimed "he could not believe he had struck the child. He picked up

20   the baby and as he lay limp in his arms, the baby's eyes rolled back into his head and he

21   thought the baby was dead or dying. He panicked so much he lost his hold of the child and

22   the child fell to the floor and hit his head. ... He picked the baby up again, took him into the

23   bathroom and put him into the tub and left him in the bath tub." *Id.* The petitioner initially

24   told the child's mother a different story, but later pleaded guilty to the offense.

25        The Board determined that Fowler was not suitable for parole and, as the Board did

26   here, relied on the fact that "the offense was carried out in an especially callous manner," as

27   well as the fact that the "motive for the crime was very trivial in relation to the offense." *Id.*

28   at *9. On habeas review, the district court concluded that "[t]hese facts simply do not support

18

a finding that the crime was committed in a 'more aggravated or violent manner' than other second degree murders, and review of the record reveals no evidence that petitioner's commitment offense was carried out with the type of gratuitous violence, torture or disregard for the victim that would permit it to be defined as 'especially callous' as that term has been defined by the California Courts." *Id.* The district court also noted that the state court judge who sentenced Fowler submitted a letter, in which that judge noted that he believed Fowler was, at the time of the crime, "'a very immature young adult who, after having indulged in the use of marijuana, could not tolerate the demands of a very young child for whom he was the expected caretaker.'" *Id.* The district court also noted that he facts "suggest that petitioner 'lacked any true intent to seriously injure the young victim.'" *Id.*

Trunzo too "was young, immature and ill prepared to be in a parental role," had indulged in drug use, and was experiencing additional stressors at the time of the offense, including unemployment, a venereal disease and the dissolution of a romantic relationship. (*See* Answer, Ex. C at 2, Ex. D at 6.) Indeed, psychiatric reports in later years of Trunzo's incarceration suggest that the offense was committed as a result of these stressors. (*See, e.g.,* Pet., App. A, Vol. IV, Ex. U at 01115; Answer, Ex. D at 6.) This factor actually tends to show *suitability* for parole. *See* Cal. Code Regs. § 2042(d)(4).

Although the nature of the commitment offense can support a finding that a prisoner is unsuitable for parole, this Court finds the facts of the commitment offense in this case to be more in line with *Fowler* than with *Dannenberg* or *Irons*, and concludes they do not demonstrate "that the circumstances of the crime were sufficiently callous, or the motive for petitioner's actions sufficiently trivial, that [24, now 29,] years after the offense the circumstances of the crime would still suggest" that Trunzo remains a danger to society. *Fowler*, 2007 WL 1555726 at *9.

The Board also cited Trunzo's failure "to profit from society's previous attempts to correct his criminality," as a basis for denying parole. The facts which support this finding pertain to Trunzo's early criminal record. The Board may consider a prisoner's "past criminal history, including involvement in other criminal misconduct which is reliably

documented," and Trunzo does not dispute his past history. 15 Cal. Code Regs. § 2402(b).

However, none of his prior convictions suggest that he has a history of violent crime, again a

factor that weighs against a finding of unsuitability and in favor of suitability. *See id.* §§

2402(c)(2), 2402(d)(6).

Further, while the record may support a conclusion that Trunzo *previously* failed to

profit from society's attempts at rehabilitation, the Board's findings are based on facts that

will never change. This Court must determine whether the Board's findings would support a

finding of *present* unsuitability. Trunzo's early record in prison certainly was not

unblemished. However, since 1988 Trunzo has shown that he is willing and able to take the

steps necessary to profit from the rehabilitative programs available to him while incarcerated

and to take those skills into society if released. Thus, the Court finds that the Board's reliance

on Trunzo's prior criminal history to determine that Trunzo posed an unreasonable risk of

danger to society is not supported by some evidence.

Finally, the Court also concludes that the Board's finding that Dr. Rueschenberg's

report was not totally supportive of release is an unreasonable interpretation of that report.

The Presiding Commissioner concluded that Dr. Rueschenberg stated Trunzo tended to

minimize the severity of the offense and referred to it as an accident. (April 2003 Tr. at 55:5-

11.) However, this ignores the preface to Dr. Rueschenberg's statement, which states that

Trunzo's tendency to minimize the severity of the crime occurred "*during the early part of his*

*incarceration.*" (Answer, Ex. D at 6 (emphasis added).) Further, as reflected in the Board's

ruling, Dr. Rueschenberg noted that "[a]t present, it does not appear likely that the

circumstances surrounding the index offense would recur. The adjustment problems that

characterized his adolescence and early adulthood now seem to be adequately contained. In

recent years, he has established a pattern of effective programming, and he seems to have

increased insight into the index offense, his substance use problems and the weaknesses in his

personality." (*Id.*) Dr. Rueschenberg also noted that "Trunzo is not normally prone to

violence. There is no documentation of overt violence during his long incarceration in

prison." (*Id.*) Furthermore, Dr. Rueschenberg's report found Trunzo's risk level to range

from "low" to "low-to-moderate," depending on the test and the factors the test took into account.[11]

These conclusions comport with Trunzo's psychiatric reports commencing from approximately 1996 onward.  In 1992, Dr. Garrett Esseres concluded that Trunzo was not yet safe for parole and explained his conclusion as follows: "Within the prison setting, with its help at maintaining his rigid and brittle coping mechanisms, he is clearly of very little danger to anybody.  Given the inconsistencies in the free community, matched with the inconsistencies in Mr. Trunzo's personality, he becomes unpredictable."  (Pet., App. A, Vol. IV, Ex. U at 01123.)  In a Category X report dated 1994, the doctors also concluded that Trunzo still needed to address "inner conflicts yet to be dealt with."  (*Id.* at 01118.)

However, in 1997, Drs. Tyler and Lyons stated that "[i]f this inmate is to be paroled or released, consideration should be given to the following: violence potential outside a controlled setting *in the past* is considered to have been average and *at present* is estimated to be less than average."  (*Id.* at 01114 (emphasis added).  In 1998, Dr. Carr reflected that continued progress and stated that "Mr. Trunzo has made substantial progress in better understanding his emotional difficulties and the effects of substance abuse upon himself.  I would estimate that his potential for violence within this institution *and the external community* to be below average when compared with the average inmate, assuming his continued sobriety."  (*Id.* at 01113 (emphasis added).)  Even in 1999, when Dr. Temkova stated that she saw some "ambivalence" in connection with Trunzo's acceptance of responsibility for the crime, she concluded that because Trunzo "is not suffering from a major psychiatric disorder, the assessment of his level of dangerousness should be based on other than psychiatric grounds."  (*Id.* at 01111.)  As such, the Court concludes that the Board's reliance on Dr. Rueschenberg's report to support a finding that Trunzo is presently unsuitable for parole is not supported by some evidence.

---

[11]  Trunzo's Life Prisoner Evaluations over the years, which, with one exception in 2002, also concluded that Trunzo would pose a low degree of threat if released.  (*See, e.g.,* Pet., App. A, Vol. IV, Ex. U at 01042, 01048, 01055, 01058, 1063.)

2.     **The Board's Continued Reliance on Unchanging Factors Raises the Due Process Concerns Articulated in *Biggs*.**

Even if there was some evidence to support the Board's reliance on the nature of the commitment offense and Trunzo's criminal history to conclude that Trunzo poses an unreasonable risk of danger if released, the Court also must consider whether the Ninth Circuit's cautionary statements in *Biggs* are implicated by this case. The Court finds that they are.

As set forth in *Biggs*,

> [o]ver time, ... , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest. ...
>
> A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

*Id.* at 916-17; *cf. Dannenberg*, 34 Cal. 4th at 1094 ("sole reliance on the commitment offense might, in particular cases, violate" section 3041(a)'s "provision that a parole date 'shall normally be set' under 'uniform term principles, and might thus also contravene the inmate's constitutionally protected expectation of parole"); *Rosenkrantz*, 29 Cal. 4th at 682-83 ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

In issuing the note of caution in *Biggs* regarding continued reliance on unchanging factors, the Ninth Circuit gave little guidance to district courts as to how they should evaluate such a claim. In *Irons,* however, the court noted that when it had determined that "a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comport[ed] with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." *Id.* The court concluded

that "[a]ll we held in [*Biggs* and *Sass*,] and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." *Id.* at 853-54. The *Irons* court further "expressed its hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." *Id.* at 854.

The lessons this Court draws from *Biggs*, *Sass*, *Irons, Dannenberg, Rosencrantz*, and various district court opinions that have applied the principles articulated therein,[12] are as follows: (1) that the Board may properly consider the nature of the commitment offense to determine whether or not a prisoner is suitable for parole; (2) that in certain instances the nature of the offense alone may support a finding that the prisoner is unsuitable for parole; and (3) at some unspecified point, the nature of the offense will no longer be of sufficient predictive value in determining whether or not a prisoner poses too great a risk of danger to be considered suitable for parole.

At the time of the April 2003 Hearing, Trunzo had served almost twenty-four years of a fifteen-years to life sentence, and had attended twelve previous parole suitability hearings.[13]

---

[12]    *See, e.g.*, *McCullough v. Kane*, 2007 WL 1593227 at *6, 9 (N.D. Cal. June 1, 2007) (finding due process violation in Governor's reversal of the Board's decision to grant parole after petitioner had served twenty-one years of fifteen years to life sentence for second degree murder and met circumstances tending to indicate suitability for parole); *Brown v. Kane*, 2007 WL 1288448 at *1 (N.D. Cal. May 2, 2007) (finding due process violation in Governor's reversal of the Board's decision to grant parole at tenth parole suitability hearing after petitioner had served twenty-four years of fifteen years to life sentence for second degree murder and met circumstances tending to indicate suitability for parole); *Pirtle v. Cal. Bd. of Prison*, 2007 WL 1140817 at *3 (E.D. Cal. Apr. 17, 2007) (finding due process violation in Board's denial of parole based on petitioner's commitment offense, criminal record, unstable social history, failure to upgrade vocationally, and need for further therapy to cope with stress), *report and recommendation adopted* 2007 WL 15446620 (E.D. Cal. May 29, 2007); *Thomas v. Brown*, 513 F. Supp. 1124 (N.D. Cal. 2006) (finding due process violation in Governor's reversal based on petitioner's commitment offense, his failure to accept responsibility, his need for further therapy, and his criminal history).

[13]    There is some dispute in the record about whether the April 2003 was, in fact, Trunzo's fourteenth parole hearing, as Trunzo contends it was. (*See* April 2003 Tr. at 14:18-15:23.) Based on the record, Trunzo twice stipulated to one year denials, once in 1988 and again in 1996. (Pet., App. A, Ex. U at 01211-12, 01260-61.) Notwithstanding this dispute, it

23

He thus had served more than his minimum sentence. *See Irons*, 505 F.3d at 853-54. At each of these hearings, the Board relied, in whole or in part, on the unchanging facts of the commitment offense and Trunzo's prior criminal record to find Trunzo unsuitable parole. The Board's decision at the April 2003 Hearing also was based on these factors. Trunzo has done everything possible to comply with the Board's recommendations. Although Trunzo's early years of incarceration were not perfect, his disciplinary record reflects no violence, and, at the time of the April 2003 Hearing, he had remained free of serious rules infractions for over fifteen years. This record apparently continues. (*See* Status Report.)

Trunzo also has upgraded both educationally, receiving A.A. and B.S. degrees, and vocationally, having completed two vocations in shoe repair and sheet metal, and has essentially completed a third in machinery. Trunzo has participated in numerous self-help and therapy programming, and he even has begun to teach other inmates how to remain violence-free. Trunzo has done everything he can to better himself while in prison, and the time that has passed since the commitment offense and Trunzo's efforts at rehabilitation seriously deprive the nature of the commitment offense of predictive value as to his future dangerousness. Moreover, as the *Irons* court reasoned, there is nothing Trunzo can do to change either the commitment offense or his criminal history. As in *Irons*, here no one contests that the killing of the defenseless child is a crime that manifests both cruelty and callousness. Nor can Trunzo's prior criminal history be disputed. However, the Board's continued reliance on these immutable factors effectively converts Trunzo's sentence of life *with* the possibility of parole into life *without* the possibility of parole, which violates Trunzo's liberty interest in parole.

Therefore, the Court finds that the Board's reliance on the nature of the commitment offense and the unchanging factor of Trunzo's criminal record to deny him parole at his April 2003 hearing violated his federal due process rights. The Court concludes that the state courts that considered Trunzo's claims regarding the April 2003 Hearing unreasonably applied the

_____

undisputed that Trunzo has been considered for parole fourteen times and has been denied parole twelve times by the Board and twice by stipulation.

some evidence standard to conclude that the Board's decision was justified. Accordingly, this

claim for relief is granted.[14]

//

//

//

//

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is GRANTED and

the Board is directed to set a release date within sixty days of the date of this Order. A

separate judgment shall issue, and the Clerk is directed to close the file.

**IT IS SO ORDERED.**

Dated: March 13, 2008

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

---

[14] In light of the Court's finding on this claim, the Court does not reach Trunzo's
Equal Protection claim.